# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3912
_____

United States of America

*Plaintiff - Appellee*

v.

Briran Blake

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: December 13, 2022
Filed: May 8, 2023
[Published]
_____

Before SMITH, Chief Judge, ARNOLD and STRAS, Circuit Judges.
_____

PER CURIAM.

A jury convicted Briran Blake of robbing two branches of Regions Bank, in violation of 18 U.S.C. § 2113(a), and brandishing a firearm during one of the robberies, in violation of 18 U.S.C. § 924(c). Following trial, Blake moved for judgment of acquittal or, alternatively, for a new trial. He argued that (1) the government's evidence was insufficient to prove his identity as the bank robber; (2)

the government's evidence was insufficient to prove the Regions Bank branches' FDIC status; and (3) the verdict was the product of jury coercion after the district court instructed the jury to continue deliberating once a jury poll revealed the initial verdict lacked unanimity. The district court[1] denied the motion. Blake appeals. We affirm.

## I. *Background*[2]

On June 9, 2017, the Hampton Avenue branch of Regions Bank in St. Louis, Missouri, was robbed ("Hampton Robbery"). The robber handed a demand note that stated: "I want 15,000 cash No ink dye All 100's and 50's No low bills. If you act historical you will be first to die that's a promise make it ASAP And I want my letter back Don't talk to anyone wait until I leave to call cops." R. Doc. 225, at 3. When the teller told the robber that she did not have $15,000, he responded, "Do it! Hurry up! I'll kill." *Id.* The teller handed the robber $1,999, and he fled the scene without taking the note.

Officer Emily Yim of the St. Louis Metropolitan Police Department (SLMPD) responded to the robbery and seized the demand note that the robber used. The bank teller reported that the robber was "a male wearing sunglasses, a stocking cap and long dreadlocks that appeared to be costume attire." *Id.*

On June 22, 2017, the South Broadway branch of Regions Bank in St. Louis, Missouri, was robbed ("Broadway Robbery"). The robber entered the branch and handed the teller, Pamela Walker, an envelope containing a demand note that stated:

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

[2]"We recite the facts in the light most favorable to the jury's verdict." *United States v. Heredia*, 55 F.4th 651, 654 (8th Cir. 2022) (internal quotation marks omitted).

"Empty the register. Don't make noise. Trust me I have a gun. You will be the first to die. Quick." *Id.* at 4. In response, Walker began removing money from the register. Another individual walked past the robber, and the robber then pulled out a firearm from his pocket. He brandished the firearm and pointed it at Walker through the opening of the teller window. She then gave the robber approximately $4,000 in cash, and he left the scene.

SLMPD Officer Michael Lowery responded to the robbery and seized the envelope and demand note. Lowery also dusted the teller tray under the teller window and developed a print ("Lift A"). Walker reported to officers that the robber was "a male wearing sunglasses, a hat and possible wig." *Id.*

SLMPD Latent Print Examiner Caitlin Coan received the seized demand notes and envelope and processed them to develop latent prints from their surfaces. And SLMPD Latent Print Examiner Whitney Betzel analyzed Lift A, the envelope, and both robberies' demand notes. She analyzed these items using the ACE-V methodology, which is an acronym for the four steps used in the process: analysis, comparison, evaluation, and verification. During this process, a latent print is run through computerized databases and generates a candidate list of individuals who may match the latent print. Then a comparison is conducted of the latent print to an individual's print.

Betzel first analyzed the prints from the Broadway Robbery. She identified Blake's left pinkie finger as the source of print C-1; Blake's left index finger as the source of print H-1; Blake's left middle finger as the source of print H-2; Blake's right thumb as the source of print E-1; Blake's left ring finger as the source of print G-1; Blake's right thumb as the source of print I-1; Blake's right index finger as the source of print J-1; Blake's left middle finger as the source of print L-1; Blake's right index finger as the source of print O-1; and Blake's left ring finger as the source of print P-1. When Betzel initially analyzed Lift A, she excluded Blake as the source of the print.

SLMPD Detective Joshua Wenstrom was assigned to the Hampton Robbery. He received Betzel's report and inquired whether Betzel would be able to do another comparison if she received additional exemplars. Betzel told Detective Wenstrom that further analysis might generate additional identifications because the prints from the Broadway Robbery included palm prints. The exemplar that Betzel had for Blake did not include palm prints. Detective Wenstrom obtained a fingerprint exemplar for Blake that included his palm prints and gave it to Betzel. The second exemplar also had clearer prints than the original exemplar. Betzel reopened the Broadway Robbery case and reexamined all unidentified prints. As a result of this second analysis, she identified Blake's left palm as the source of prints B-1 and M-1.

The second exemplar for Blake caused Betzel to change her evaluation of Lift A. When Betzel had originally analyzed Lift A and compared it to the original exemplar, she "didn't see enough correspondence between the latent print and the known print card" and excluded Blake as the source. R. Doc. 242, at 108. But after receiving the second exemplar, she determined that Blake's left pinkie finger was the source of the print in Lift A. Betzel determined that the latent print in Lift A came from a portion of Blake's left pinkie finger that was to the side of the core—a region that was very smudged on the first exemplar but that was clearly depicted in the second exemplar.

Betzel also analyzed the prints from the Hampton Robbery. She identified Blake's left palm as the source of print C-1; Blake's right thumb as the source of print D-1; Blake's left ring finger as the source of print F-1; and Blake's left palm as the source of print G-1.

During the fourth step in the ACE-V methodology—the verification by a second examiner—Betzel's evaluations were all verified by SLMPD Latent Print Examiner Caitlyn Shelar.

Following her analysis based on the two exemplar print cards for Blake, Betzel personally rolled Blake's prints and created a third exemplar set. Next, she analyzed that exemplar set. She determined that the fingerprints that she personally obtained from Blake matched both of the exemplar cards used in her earlier analysis.

Blake was indicted for the Hampton Robbery and Broadway Robbery and for brandishing a firearm during the Broadway Robbery. The district court granted Blake's motion to represent himself.

During trial, Betzel identified Blake as the source of the third exemplar set. The jury saw an exhibit summarizing Betzel's conclusions about her fingerprint analysis. Betzel identified Blake as the source of 17 prints from the two scenes: 4 from the demand note from the Hampton Robbery, 1 from the teller tray from the Broadway Robbery, 1 from the demand note from the Broadway Robbery, and 11 from the envelope that contained the demand note from the Broadway Robbery.

Blake cross-examined Betzel on her initial conclusion excluding him as the source of the latent print in Lift A. She admitted that she initially excluded him as the source of that print and explained the meaning of an exclusion conclusion. Blake then cross-examined her about the scientific reliability of fingerprints. In response, Betzel explained that she used accepted scientific methods. Blake also cross-examined Betzel about her contact with Detective Wenstrom, the investigating detective of the Hampton Robbery. Blake questioned Betzel about receiving a request from Detective Wenstrom "to analyze another detective's report" despite never receiving "a request from the actual detective" assigned to the Broadway Robbery. R. Doc. 242, 145–46. Betzel testified that she briefly spoke with Detective Wenstrom after the first analysis and then not again until a prior court proceeding. Blake inquired of Betzel, "Now, why would Detective Wenstrom want you to review another detective's police report, or analyze another detective's fingerprints?" *Id.* at 146. Betzel explained that reports are "released to the assigned detective as well as to the district that the district

detectives that are assigned as well. So any detective in that bureau would have access to the reports." *Id.*

Walker, the teller during the Broadway Robbery, also testified. During direct examination, the government did not ask Walker to identify the individual who robbed her, nor did she testify to the robber's identity. But on cross-examination, Blake asked Walker if she could "identify the individual in the courtroom here today." R. Doc. 241, at 193. Walker responded by identifying Blake as the bank robber. She made repeated identifications of Blake in response to follow-up questions from him. She stated, "I will never forget you," in reference to Blake holding her at gunpoint. *Id.* at 194. She testified, "You were as I described to the detective when he asked me to describe you, and I particularly remember thinking how nice your skin is." *Id.* In response to Blake's questioning, Walker also identified Blake as the robber based on his skin tone, body size, shape, and height, and the way he walked. When Blake asked Walker when she saw him walk, she indicated she observed him walking in the courtroom during the recess.

The government submitted the following evidence as proof that each Regions Bank branch was insured by the Federal Deposit Insurance Corporation (FDIC) on the date of the robbery: (1) a current Regions Bank FDIC certificate, (2) public records documenting that the specific branch robbed was covered by Regions Bank's policy, and (3) a certification that a diligent search of FDIC records failed to disclose any records showing that the FDIC policy was terminated prior to the date of the robbery.

The FDIC records established that Regions Bank's FDIC policy is active and has been since January 1, 1934, under Certificate Number 12368. The records showed that Regions Bank had a branch location at 3547 Hampton Avenue—the location of the Hampton Robbery—until June 23, 2019, and that this branch was covered by Regions Bank's FDIC policy under Certificate Number 12368. Likewise, the records

showed that Regions Bank has an active branch at 3803 South Broadway—the location of the Broadway Robbery—and that this branch was covered by Regions Bank's FDIC policy under Certificate Number 12368. The records included a certified and authenticated copy of that certificate. The records also certified that a diligent search of FDIC records found no documents terminating the FDIC status of Regions Bank prior to (1) June 9, 2017, the date of the Hampton Robbery, or (2) June 22, 2017, the date of the Broadway Robbery.

Following the close of the government's case, Blake moved for a judgment of acquittal. He argued that the government failed to "prove[] beyond a reasonable doubt that [he] is actually the person that committed these crimes." R. Doc. 242, at 157. The government responded that evidence of 17 finger or palm prints connecting Blake to the demand notes, envelope, and teller tray was sufficient evidence linking Blake to the crime. The government also cited Walker's identification of Blake as the robber. The district court denied the motion, concluding that the fingerprint evidence alone was sufficient for purposes of identification.

After the government rested, Blake recalled Betzel in his own case. He once again questioned her about the initial exclusion of him as the source of Lift A, as well as her contacts with Detective Wenstrom. Blake also inquired into new areas of examination, including that Betzel reviewed some of the materials in this case when she was a trainee. He also elicited testimony that the first fingerprint identification of Blake in relation to this case occurred almost two years after the robbery.

Blake also called Shelar to testify. Shelar, the latent fingerprint analyst who reviewed Betzel's report, verified the accuracy of Betzel's report upon questioning by Blake.

At the close of all evidence, Blake renewed his motion for judgment of acquittal but did not provide any additional argument. The district court again denied the motion.

The jury began deliberating at 3:24 p.m. on the third day of trial and recessed their deliberations at 5:03 p.m. The jury resumed deliberations at 9:07 a.m. on the fourth day of trial. At 9:34 a.m., the court called the parties into the courtroom outside of the jury's presence. The court advised the parties that the jury had sent a note asking, "If we reach a verdict and present it to the Court, does every juror need to state in the courtroom as to their individual vote or answer to the charges." R. Doc. 244, at 4. The district court suggested to the parties that its response would be the following: "The answer to your question is yes. Each juror will be asked if the verdict is their verdict." *Id.* Neither the government nor Blake objected to the proposed response. The court submitted the response in writing to the jury. At 9:56 a.m., the jury returned its first verdict. The verdict indicated a finding of guilt on all three charges. The district court sua sponte polled each juror. When asked, "is the verdict that I have just read your verdict?", Jurors One through Nine confirmed that it was, but Juror Ten responded, "No." *Id.* at 6–7. The district court ceased polling the jurors and instructed the jury to "return to the jury room and continue deliberations." *Id.* at 7–8. Neither the government nor Blake objected to the continued deliberations.

At 9:58 a.m., the jury returned to the jury room to continue deliberations. At 10:47 a.m., the jury returned with a second verdict. The second verdict again indicated a finding of guilt on all three charges, and the district court sua sponte polled each juror. This time, all 12 jurors answered that the announced verdict was their verdict. The district court dismissed the jurors.

Blake moved for a mistrial. He argued that "the first time [the jury] came out here, [Juror Ten] . . . couldn't reach the same verdict as everybody else, and after she went back in there, she changed her verdict. And as you can see from her attitude and

her demeanor, she really didn't want to do that." *Id.* at 12–13. The court denied the motion, stating, "It was clear that this was a difficult decision for the jury, for one particular juror as well, but the juror did affirm that this is the verdict of the jury, and the Court is satisfied that it is her verdict. So the Court is accepting the verdict." *Id.* at 13.

Blake moved for judgment of acquittal or alternatively a new trial. Blake argued that the evidence of his identity as the robber was based on "circumstantial fingerprint evidence, mere conjecture, and impermissible inferences." R. Doc. 222, at 6. According to Blake, the testimony of both Betzel and Walker was incredible and could not be relied upon. He also argued that the evidence of the Regions Bank branches' FDIC insurance was insufficient. Seeking a new trial, Blake argued that the district court's instruction to the jury to continue deliberating after the court rejected the first verdict based on Juror Ten's response caused a coercive second verdict. He also suggested that the second verdict was a product of intimidation and that, at the very least, the district court should have asked Juror Ten if she had been intimidated into changing her verdict.

The district court denied Blake's post-trial motion. It first addressed Blake's request for entry of judgment of acquittal. In response to Blake's argument that insufficient evidence existed that he was the robber, the district court observed that "Betzel offered extensive testimony [about the fingerprint evidence] and was recalled by [Blake]." R. Doc. 229, at 4. The court recounted that Blake had "aggressively challenged" Betzel in his questioning of her. *Id.* at 5. Additionally, the court noted that Shelar had verified Betzel's report during Blake's questioning of Shelar. The district court concluded that Blake was "merely rehash[ing] the same issues addressed at trial" by "reiterat[ing], for example, that Ms. Betzel reached a different conclusion upon receiving the second known print and that extensive time expired before Ms. Betzel even performed her analyses." *Id.* The court characterized Blake's arguments as "present[ing] exactly the sort of credibility issues which are inappropriate for this

Court to consider on a motion for judgment of acquittal." *Id.* "Drawing all inferences in the [g]overnment's favor," the court explained, "a reasonable jury could have accepted Ms. Betzel's testimony and reached a guilty verdict." *Id.* at 6.

The district court also rejected Blake's challenge to Walker's eyewitness identification. Although the court acknowledged that Blake "ha[d] offered numerous persuasive challenges to the credibility of this identification," it ultimately concluded "that the fingerprint evidence and other testimony in this case were sufficient to permit a conviction absent any eye-witness identification from Pamela Walker." *Id.* at 6 n.1.

The court further held that the government "presented proper testimony and entered exhibits on precisely [the FDIC insurance] issue" and that the evidence was sufficient to sustain a conviction. *Id.* at 6.

The court also denied the motion for new trial on the same evidentiary issues. Based on the fingerprint evidence, it found that the jury "reached the reasonable conclusion that [Blake] committed the Hampton and South Broadway Robberies." *Id.* at 7. It characterized Betzel's testimony as "reasonably credible" and corroborated by Shelar, the verifier whom Blake called. *Id.* at 8. The court held that the evidence was sufficient to sustain the verdict and denied the motion for a new trial. Again, the court's determination that the evidence of identity was sufficient was solely based on the fingerprint evidence without considering Walker's identification.

The court further denied the motion for new trial based on alleged juror coercion. The district court considered "various factors" to determine whether its polling of the jury constituted coercion. *Id.* at 10. These factors, the court explained, "clearly demonstrate[d] that the jury's guilty verdict was not coerced." *Id.* "First, [Blake] did not make any objection after the initial polling, despite th[e] [c]ourt offering an opportunity on the record." *Id.* "Second, the [c]ourt immediately ordered

-10-

the jury to continue deliberating and did not isolate Juror No. 10 by polling the remaining jurors." *Id.* "Third, the jury deliberated for close to one hour before returning with a unanimous guilty verdict." *Id.* "Finally, the [c]ourt did not make any intimidating comments or demand that Juror No. 10 provide categorical answers to difficult questions after giving her initial answer." *Id.* at 10–11. The court concluded that its "decision to immediately return the jury for deliberations was consistent with Rule 31(d), essentially neutral, and not calculated to affect the juror's judgment." *Id.* at 11 (cleaned up). As such, the district court concluded that it was not likely that the proceedings coerced the juror in arriving at her final verdict, and it was also "satisfied that [the verdict of the jury] is her verdict." *Id.* at 12 (quoting R. Doc. 218, at 6). Therefore, the court denied the motion.

## II. *Discussion*

On appeal, Blake argues that the district court erred in denying his motion for judgment of acquittal or, alternatively, a new trial because (1) the government's evidence was insufficient to prove his identity as the bank robber; (2) the government's evidence was insufficient to prove the Regions Bank branches' FDIC status; and (3) the verdict was the product of jury coercion after the district court instructed the jury to continue deliberating once the jury poll revealed the initial verdict lacked unanimity.

"We review the denial of a motion for judgment of acquittal de novo. We review the facts in the light most favorable to the verdict and will affirm if a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." *United States v. Sholley-Gonzalez*, 996 F.3d 887, 895 (8th Cir. 2021) (cleaned up). We review for an abuse of discretion a district court's denial of a motion for new trial and will reverse "only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." *Id.* (internal quotation marks omitted).

-11-

A. *Sufficiency of the Evidence*

Blake first challenges the sufficiency of the evidence. "When considering the sufficiency of the evidence, we consider the evidence in the light most favorable to the guilty verdict." *United States v. Bartolotta*, 153 F.3d 875, 878 (8th Cir. 1998). The government receives "the benefit of all reasonable inferences that might be drawn from the evidence." *Id.* (internal quotation marks omitted). "[O]nly if no construction of the evidence exists to support the jury's verdict" will we "reverse a conviction for insufficient evidence and order the entry of a judgment of acquittal." *Id.* (internal quotation marks omitted).

The jury convicted Blake of robbing two branches of Regions Bank, in violation of 18 U.S.C. § 2113(a): the Hampton Robbery on June 9, 2017, and the Broadway Robbery on June 22, 2017. The jury also convicted Blake of brandishing a firearm in furtherance of the Broadway Robbery, in violation of 18 U.S.C. § 924(c).

Section 2113(a) "criminalizes the taking of money or property from a bank, credit union, or savings and loan, either by force and violence, or by intimidation." *Bartolotta*, 153 F.3d at 878 (internal quotation marks omitted). There are three main elements of a § 2113(a) charge: (1) the defendant "t[ook], or attempt[ed] to take, from the person or presence of another, . . . any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank," 18 U.S.C. § 2113(a); (2) the taking or attempted taking was "by force and violence, or by intimidation," *id.*; and (3) "the deposits of [the bank] are insured by the Federal Deposit Insurance Corporation," *id.* § 2113(f); *see also* 8th Cir. Crim. Jury Instr. § 6.18.2113A (2022).

"The section 924(c) charge in this case required the government to establish three elements: that [Blake committed the Broadway Robbery], that he possessed a firearm, and that his possession of the firearm was 'in furtherance of' the [robbery]."

*United States v. Bailey*, 882 F.3d 716, 720 (7th Cir. 2018) (quoting 18 U.S.C. § 924 (c)(1)(A)).

### 1. *Robber's Identity*

For both the § 2113(a) convictions and the § 924(c) conviction, Blake argues that the government failed to prove that he was the bank robber. He argues that "[t]he government unreasonably relied upon the ever-changing opinion of fingerprint analyst Whitney Betzel from the [SLMPD] and [the] in-court identification of [Walker]." Appellant's Br. at 9.

Blake's "challenge largely rests on his disagreement with the jury's credibility determinations regarding the trial witnesses and on purported inconsistencies in the testimony of [Betzel] and [Walker]." *United States v. Brown*, 992 F.3d 665, 671 (8th Cir. 2021). "But the jury has sole responsibility for resolving conflicts or contradictions in testimony, and we must resolve credibility issues in favor of the verdict. We conclude that the evidence was sufficient for the jury to find, beyond a reasonable doubt, that [Blake] was the [robber]." *Id.* (cleaned up).

Betzel testified extensively about her analyses of fingerprints taken from the scenes of both robberies. She recounted the method that she used to analyze the fingerprints and explained how she reached her conclusion that Blake was the source of those fingerprints. Blake's main defense at trial was to challenge Betzel's credibility by questioning whether Detective Wenstrom and Betzel colluded to fabricate fingerprint evidence against Blake when Betzel reopened the Broadway Robbery case and reexamined all unidentified prints. As the district court observed, Blake, "proceeding pro se, aggressively challenged Ms. Betzel's conclusions." R. Doc. 229, at 5. Ultimately, it was for the jury to determine whether to credit Betzel's testimony. *Brown*, 992 F.3d at 671.

Additionally, the district court did not abuse its discretion in denying Blake's motion for a new trial based on Blake's challenge to Betzel's testimony. As the court explained, the jury determined that Blake committed the robberies after hearing Betzel's testimony "that she adjusted her findings after receiving higher-quality fingerprint exemplars belonging to [Blake]." R. Doc. 229, at 7. The court found Betzel's testimony to be "reasonably credible," especially considering Betzel's confirmation "that she accurately applied the ACE-V method" and Shelar's corroboration of Betzel's "revised analysis." *Id.* at 8.

As to Blake's challenge to Walker's in-court identification of him, it was within the province of the jury to determine whether to credit her testimony. *Brown*, 992 F.3d at 671. To the extent we consider Walker's credibility for purposes of reviewing the district court's denial of Blake's motion for a new trial, we discern no abuse of discretion. The district court acknowledged that Blake "offered numerous persuasive challenges to the credibility of this identification" but ultimately concluded "that the fingerprint evidence and other testimony in this case were sufficient to permit a conviction absent any eye-witness identification from Pamela Walker." R. Doc. 229, at 6 n.1.

## 2. *FDIC Status of Regions Bank*

Blake also argues that insufficient evidence exists "of whether the banks were insured by the FDIC on the date of the offense." Appellant's Br. at 24. Specifically, he claims that "[t]he government failed to admit a valid certificate," *id.*, that the branches of Regions Bank were insured "on the date of the robbery," *id.* at 26.

"Bank robbery is a federal crime only if the institution robbed is a federally chartered financial institution or is insured by a federal deposit insurer." *United States v. Davis*, 406 F.3d 505, 511 (8th Cir. 2005) (citing 18 U.S.C. § 2113(f)–(h) (defining "bank," "credit union," and "savings and loan")). Here, "[t]he [g]overnment relied on the fact that [Regions Bank] was insured by the FDIC to satisfy the statutory

requirements of 18 U.S.C. § 2113(f)." *United States v. Rusan*, 460 F.3d 989, 993 (8th Cir. 2006).

"We have stated that a copy of the insurance certificate issued by the FDIC, proof of payment of the insurance premium, and the testimony of a bank officer (or other knowledgeable employee) that the bank's deposits are insured is sufficient to prove that the bank was insured by the FDIC." *Id.* at 994. "[I]deal evidence" of a bank's FDIC status is "the actual certificate and proof of payment," but "we have upheld many cases on testimony alone." *Id.*

In *Rusan*, we affirmed a bank robbery conviction where the government admitted a photograph of a certificate hanging on the wall of the bank on the day of the robbery and offered testimony of a bank employee that the bank was insured. *Id.* We noted that such evidence "may well be approaching what we would consider the bare minimum" "standard of proof of insured status." *Id.* We further explained that

> [t]he photocopy of the plaque itself is likely not enough to establish [the bank]'s insured status [on the day of the robbery], but when admitted in conjunction with the testimony of . . . an employee . . . of the bank for over 30 years, it is enough to satisfy us that a jury could have reasonably found that the bank was insured on the day of the robbery.

*Id.*[3]

---

[3]*See also United States v. Lewis*, 260 F.3d 855, 855–56 (8th Cir. 2001) (holding insured status proven by statement of bank manager that deposits are insured by the FDIC); *United States v. Hadamek*, 28 F.3d 827, 827–28 (8th Cir.1994) (stating that testimony from bank president that deposits are insured was sufficient to allow jury to draw inference that bank was also insured at time of robbery); *United States v. Mays*, 822 F.2d 793, 796 (8th Cir.1987) (holding that testimony of bank manager that bank was insured was enough to satisfy requirement and noting that testimony of bank manager on this matter should receive the same evidentiary weight as that of a bank officer).

The evidence offered in the present case exceeds what was offered in *Rusan* and sufficiently proved the Regions Bank branches' FDIC status. The government presented testimony and introduced exhibits proving that the deposits of Regions Bank were insured by the FDIC and that the policy was in effect at the time of the robberies. Specifically, the government admitted into evidence the certified and stamped copies of the FDIC certificates. The FDIC issued these certificates in conjunction with the name change to Regions Bank on November 12, 1996. The government also admitted into evidence the certificates of authenticity for the Hampton branch and Broadway branch. Finally, the government provided a certification that a search of the FDIC records did not show cancellation of the insurance before the robbery. Accordingly, we hold that the evidence presented was sufficient to establish the Regions Bank branches' FDIC status.

## B. *Jury Deliberations*

Finally, Blake argues that the district court abused its discretion in denying his motion for new trial based on the court's directive to the jury to continue deliberations after Juror Ten indicated the guilty verdict was not her verdict. He asserts that "[t]he district court's directive to continue deliberations, despite one holdout juror, amounted to an intimidating and coercive environment and tainted [his] right to a fair and impartial jury in violation of his [S]ixth . . . [A]mendment rights." Appellant's Br. at 32. He further argues that the district court erred in denying his motion for a mistrial after the jury returned and announced a unanimous verdict. According to Blake, although Juror Ten "responded yes" when polled, the record shows that she "took a significant period of time before answering in the affirmative." *Id.*

"After a verdict is returned but before the jury is discharged, the court . . . may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury." Fed. R. Crim. P. 31(d). The purpose of polling the jury is to provide every

juror with the "opportunity, before the verdict is recorded, to declare in open court his assent to the verdict, and ensures that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." *United States v. Sims*, 999 F.3d 547, 553 (8th Cir. 2021) (internal quotation marks omitted).

Rule 31(d) "specifically grants the trial judge a measure of discretion in determining either to require the jury to deliberate further or to grant a mistrial if it appears that the verdict was not unanimous." *Amos v. United States*, 496 F.2d 1269, 1272 (8th Cir. 1974). Here, the district court "directed that the jury retire for further deliberation after learning that [Juror Ten] did not concur in the finding of guilt on any of the counts." *Id.* "Whether that ruling constitutes error depends on whether it is likely that the proceedings conducted by the trial court coerced the juror in arriving at his final verdict." *Id.*

> We [have] note[d] a distinction between a case where the trial judge interrogates the jury to clarify the confusion engendered by a juror's response to a poll which is inconsistent with the foreman's announcement of the verdict, as in the present case, and one in which the court requires a jury to reveal its decision when no verdict has been returned . . . .

*Id.* at 1273. "[I]n the former," the district court is afforded "some latitude in polling of the jury to clear up an apparent confusion." *Id.* But "[i]n the latter circumstances, the court's actions will be deemed coercive." *Id.*

"Applying these principles, we hold that this record demonstrates that [the district court] interrogated [Juror Ten] to dispel any confusion." *Id.* First, when Juror Ten indicated a position inconsistent with the foreman's announcement of the guilty verdict, the district court "promptly refused to receive the verdict and directed that the jury resume deliberations." *Id.* Second, at that time, neither the government nor Blake

-17-

objected to the continued deliberations. *See id.* Blake did not move for a mistrial until the second verdict was returned.[4] Third, "the jury deliberated for close to one hour before returning with a unanimous guilty verdict," suggesting the lack of any coercion. R. Doc. 229, at 10; *see also Amos*, 496 F.2d at 1272 (approving a verdict returned only 25 minutes after the initial polling). Fourth, at no time did the district court "demand[] in-court categorical responses" from Juror Ten once she expressed disagreement with the verdict. *Amos*, 496 F.2d at 1272 n.3 ("In the cases finding verdicts to be coerced, the trial courts had demanded in-court categorical responses from jurors who expressed reservations or recalcitrance when polled, instead of returning the juries for additional deliberations."). In summary, the district court's "inquiries were essentially neutral and not calculated to affect the juror's judgment. We find no error of law or fact in this determination and, accordingly, affirm this ruling." *Id.* at 1273 (internal quotation marks omitted).

Further, once the jury returned and announced a unanimous verdict and Blake finally moved for a mistrial, the district court made a specific finding that there was no coercion. As a result, we cannot say that the district court abused its discretion. *See id.* ("[I]n evaluating the trial court's polling procedure, since the trial judge is present on the scene, we must pay due deference to his views on whether the recalcitrant juror's ultimate acquiescence in the verdict came freely, without pressure from the court.").

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

[4]We, like the district court, consider the lack of objection "slightly less critical here where [Blake] was proceeding pro se." R. Doc. 229, at 10.